

The following constitutes the order of the Court.
Signed: June 7, 2024

_____
**Stephen L. Johnson**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>SAN BENITO HEALTH CARE DISTRICT dba HAZEL HAWKINS MEMORIAL HOSPITAL,<br><br>Debtor. | Case No. 23-50544 SLJ<br><br>Chapter 9 (Dismissed)<br><br>Date: June 4, 2024<br>Time: 2:00 p.m.<br>Ctrm: 10 |

### ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL

San Benito Health Care District dba Hazel Hawkins Memorial Hospital ("District") filed an Emergency Motion for Stay Pending Appeal ("Motion"), which came on for hearing at the above-referenced date and time. California Nurses Association ("CNA") and National Union of Healthcare Workers ("NUHW") (collectively, "Unions") objected to the Motion. The District filed a reply to the oppositions ("Reply"). Appearances were noted on the record, and after hearing arguments from counsel, the court took the matter under submission.

This decision assumes familiarity with the court's Order Following Trial on Chapter 9 Eligibility for Order for Relief ("Eligibility Order"), which sets out the underlying facts and procedural history of the case, and was entered after a four-day bench trial. The court

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
1/18

concluded that the District was not eligible for chapter 9 relief and dismissed the case.[1] The District has appealed the Eligibility Order.

The Ninth Circuit described the standard for a stay pending appeal as follows: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."[2] *Sierra Club v. Trump*, 929 F.3d 670, 687 (9th Cir. 2019), quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009). The first two factors "are the most critical," and we only reach the last two "[o]nce an applicant satisfies the first two factors." *Id.* at 434-35. The sliding scale approach used by the Ninth Circuit remains viable in consideration of stays pending appeal. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). Under this approach, "a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. at 433 (internal quotation marks and citation omitted). Issuing a stay

---

[1] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[2] Because the factors that inform the decision to stay pending appeal are essentially the same as those applicable to a motion for a preliminary injunction, the court occasionally uses caselaw pertaining to preliminary injunctions in analyzing the factors. *See Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983) ("The standard for evaluating stays pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction."); *In re SK Foods, L.P.*, 2009 WL 5206639, at *2 (E.D. Cal. Dec. 24, 2009) ("In evaluating a motion for stay pending appeal, the Ninth Circuit has directed that equitable criteria be utilized similar to the criteria applicable for evaluating a motion for preliminary injunction." (citing *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980)).

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
2/18

is therefore "an exercise of judicial discretion" not to be issued "reflexively," but rather based on the circumstances of the particular case. *Id.* at 427, 433. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34.

One point of order. The District specifically requests "an order staying the effectiveness of the Eligibility Order pending the outcome of the appeal…" Motion, p. 25:25-26. The District does not explain what such a stay would mean from a practical and legal viewpoint. Generally, the automatic stay terminates upon dismissal of a case. 11 U.S.C. § 362(c)(2)(B). A stay pending appeal temporarily suspends the order or judgment being appealed, thereby preventing "judicial alteration of the status quo." *Nken v. Holder*, 556 U.S. at 429. A dismissal order eliminates the bankruptcy case. *See generally* 11 U.S.C. § 349(b). Thus, the staying of a dismissal order would keep the bankruptcy case open, including the reimposition of the automatic stay. *See In re Bidermann*, 1994 WL 376090, at *1 (S.D.N.Y. July 18, 1994); *Shaw v. Ehrlich*, 294 B.R. 260, 274 (W.D. Va. 2003) ("if a debtor does not seek the protection of a stay pending appeal … creditors are free to take action to enforce their rights in the debtors' assets from the moment that the dismissal order is entered."); *In re Kilgore*, 2001 WL 848587, at *1 (W.D. Va. July 29, 2001) (Court declining to grant a stay pending appeal of the order of dismissal, "which would have the effect of reestablishing the automatic stay."). Here, staying the Eligibility Order dismissing the case would have the effect of temporarily suspending the Eligibility Order, as if this case had not been dismissed, including the imposition of the automatic stay.

The court will first consider whether the District has carried is burden of proof on harm. The party seeking a stay must demonstrate that irreparable injury is "likely" in the absence of an injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Simply showing some "possibility" of irreparable injury is not enough to satisfy the second factor. *Id.* at 22. "Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown." 11A C.

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
3/18

Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948.1 (3d ed.) (hereinafter Wright & Miller). "There must be a sufficient causal connection between the alleged irreparable harm and the activity to be enjoined, and showing that the requested injunction would forestall the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quotation marks and citation omitted).

The District asserts three kinds of irreparable injury in the Motion. First, the District faces the loss of potential transaction partners due to the case's dismissal. Second, the postpetition loan it hoped to obtain from California's Distressed Hospital Loan Program (DHLP) was rescinded. Finally, CNA has demanded damages resulting from the District's unilateral modifications to the CBA during the bankruptcy case.[3]

It appears that originally, the District had four potential transaction partners but two have dropped out. At the hearing on this matter, the District argued that circumstantial evidence of the timing proved these drop offs stemmed from the dismissal of the case. The evidence submitted in connection with the District's Reply was equivocal. In her Supplemental Declaration, Casillas, the District's CEO, says that two of four original potential partners decided not to move forward, but "[n]either party has indicated with specificity why they withdrew their offers for consideration following dismissal of the Bankruptcy Case." Supplemental Declaration of Mary Casillas, ECF 247, p. 2:19-20.

The record does not support a conclusion that the two interested parties dropped off due to the case's dismissal. CNA, as part of its opposition, submitted a transcript of a portion of the District's board meeting held on April 25, 2024 ("Board Meeting").[4] *See* Exhibit F to the Declaration of Kyrsten Skogstad (ECF 240). At the Board Meeting, B. Riley

---

[3] The court uses the term "CBAs" to refer to the collective bargaining agreements and/or memorandum of understanding between the District and the Unions for the sake of convenience.

[4] As indicated in the declaration, the audio of the Board Meeting can be found at https://www.youtube.com/watch?v=7xPAbhHZk5w. No one objected to this evidence, which occurs during a public meeting posted on the District's YouTube channel.

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
4/18

consultant Richard Peil ("Peil") gave an oral report to the Board pertaining to the transaction process, including an update on the two parties who withdrew their interest. As to the interested party called AAM, Peil stated, "They recently acquired the Madera Hospital out of bankruptcy and I've been told that has stressed, not stressed, but stretched many of their resources both financial and just time resources so I don't anticipate that they will be making any modifications to the prior proposal they had made and you know I'm not really sure going forward if they're really in a position to take on another transaction." (cleaned up).[5]

A person identified at the Board Meeting as J.P. Smith appeared for the other potential partner, San Benito Healthcare Alliance ("SBHA"). He informed the Board that "[SBHA Ovation] withdrew because they weren't able to glean enough information to be able to provide a credible presentation to you folks and they didn't want to waste anybody's time by saying they needed more information. They know you've gone through a long and exhaustive process and didn't wish to go ahead and prolong it any longer." (cleaned up).

The proceedings at the Board Meeting cast doubt on the District's contention that its value, and thus purchase price, increased post-dismissal because of the costs of unwinding the District's unilateral modifications to the CBAs. At the Board Meeting, Peil instead stated that "the primary reason for that increase relates to basically a change in the transferable networking capital balance between their original report date … to the as of date of the current report … that's primarily due to how certain working capital assets and liabilities have been categorized as transferable versus non-transferable…" (cleaned up).

The District's Reply dismisses what was said at the Board Meeting as "speculation" by CNA, but that characterization does not seem accurate given the public record of that meeting. To emphasize, much of the oral update came from the District's own consultant. Ignoring what occurred at the Board Meeting, the District urges a conclusion that is based

---

[5] The court takes judicial notice of the docket of *In re Madera Community Hospital*, Case No. 23-10457, pending in the Bankruptcy Court for the Eastern District of California, and the Order Confirming Modified Seconded [sic] Amended Chapter 11 Plan of Liquidation Proposed by the Official Committee of Unsecured Creditors, filed on April 17, 2024, Docket No. 1707, which includes provisions on the involvement of AAM.

solely on circumstantial evidence – timing. Given the contrary evidence, resort to speculation about why potential transaction partners withdrew is unwarranted.

Irreparable harm must be shown and it must be based on the evidence.[6] *See Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1133 (9th Cir. 2014) (a movant "must establish a likelihood of irreparable harm that is grounded in evidence, not in conclusory or speculative allegations of harm."). The court cannot find that the District has met its burden of proof regarding harm on this record.

Turning to the arguments about the loan from DHLP, the court finds no injury, let alone irreparable injury. The District was approved for a $10 million loan from the DHLP after the bankruptcy case was filed but before it was dismissed. The District's contentions on this point have shifted. In the Motion, the District asserts that the state agency administering the loan "has rescinded the District's original approval for a $10 million loan … [which] was based on the approximately $7 million annual negative impact of the dismissal on the District's cash flow associated with the rollback of unilateral benefits modifications." Motion, p. 1:16-18. The District thus reasons the "potential loss of cash flow loan proceeds" constitutes irreparable injury. The only evidence supporting this argument is an email from the District's counsel to DHLP which appears to be a summary of a conversation. But that communication makes no mention of the $7 million negative impact caused by the dismissal.

In their oppositions, the Unions contested the loan was no longer available. They argue that the District in fact received approval for a $10 million loan. The District in the Reply concedes the loan is available but contends the revised loan contains onerous terms and that "the failure to obtain a stay has already harmed the District's access to credit essential to funding capital expenses immediately necessary to preserve continued operations." Omnibus Reply, p. 10:8-9.

---

[6] The same reasoning applies to the District's argument that the dismissal negatively affects its valuation but the extent to which how it "will affect the financial viability of a transaction is not yet clear to the District." Motion, p. 22:28.

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
6/18

The alleged irreparable injury, the complete loss of the DHLP loan, was speculative at the time the Motion was filed. It has not occurred and is now a moot point. For the sake of completeness, the court will address Debtor's allegations, made solely in its Reply, that the revised loan's onerous terms constitute irreparable harm.

The District maintains that the revised loan terms from the State of California are materially worse than the loan terms given to it while it was in bankruptcy. The red-lined version of the DHLP Loan and Security Agreement ("Red-Lined Loan Agreement") which compares it to the original document was attached to the Supplemental Declaration of Mary Casillas. ECF 247, Exhibits A and D.

Regarding the roll-up, the Red-Lined Loan Agreement says this:

> If Borrower commences a restructuring under chapter [9/11] of the Bankruptcy Code before the Maturity Date and seeks debtor-in-possession financing from the Lender, the Lender agrees to "roll up" the Loans under this Facility into a debtor-in-possession financing facility on a dollar-for-dollar basis and on such other terms and conditions acceptable to the Lender. ECF, p. 72.

This language is repeated as one of the District's covenants (ECF 247, p. 81).

The District first argues the new documents contain a harmful "roll-up" provision that was absent from the original documents. The District does not explain why this provision is harmful in its papers. On its face, the provision only seems to state something obvious, that if the District returns to bankruptcy and if it obtains another loan from the State of California, it is anticipated that loan would be combined with the loan now being proposed (or, rolled-up). At the hearing, the District clarified that the provision is onerous because, should the District files another bankruptcy case, the loan will be rolled up in any postpetition financing from the state agency. This injury will only occur only if the District files another bankruptcy and obtains postpetition financing.[7]

---

[7] The roll-up provision itself is not the injury. The injury that the District alleges at the hearing will only occur upon certain conditions that trigger the roll-up provision. In other words, if the District does not file a bankruptcy case during the loan term, the roll-up provision will not be implicated and the alleged injury will not occur.

The District's arguments do not show actual harm, but potential harm. The mere possibility of harm is not enough to support the issuance of a stay. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. at 22. The District has not presented any evidence that it is likely to file another bankruptcy case and that it is likely to seek and obtain postpetition financing in that future bankruptcy. *See Al Otro Lado v. Wolf*, 952 F.3d at 1007 ("The minimum threshold showing for a stay pending appeal requires that irreparable injury is likely to occur *during the period before the appeal is likely to be decided.*" (emphasis added)); *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("[T]he person or entity seeking injunctive relief must demonstrate that irreparable injury is likely in the absence of an injunction. An injunction will not issue if the person or entity seeking injunctive relief shows a mere possibility of some remote future injury, or a conjectural or hypothetical injury." (quotations omitted)).

The District also contends the disbursement conditions are more onerous. The District points to the new agreement's requirement that the District produce detailed budgets to support its requests for advances of loan funds from the State. But the original lending agreement also required budgets – just not under ¶ 2. Instead, under the original lending agreement, the District was obliged to comply with ¶¶ 5(a) and (b) in making funding requests. ECF 247, p. 16. *See* ¶ 2(b) (ECF 247, p. 11). Those paragraphs required a budget that the lender had pre-approved and were dependent on Bankruptcy Court approval of the proposed funding. In other words, the original lending agreement required detailed information be submitted to the court and to the lender before lending would be authorized.

It is worth noting that many of the proposed loan terms are unchanged. The loan continues to be "interest-free" (ECF 247, p. 64). And some of the provisions would appear to be somewhat less onerous. Under the revised agreement, the State of California no longer requires a super-priority lien in accordance with Bankruptcy Code § 364(c)(2). ECF 247, p. 73.

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
8/18

The contention that complying with CNA's demands arising out of the District's pendency plan ("Pendency Plan") is more difficult to analyze.[8] It is a fact that CNA sent a letter to the District, dated April 9, 2024, in which it requested a meeting with the District to discuss unwinding the unilateral modifications to the CBA that occurred while the case was pending. CNA also states in the letter that, with the dismissal of the case, the unilateral modifications are not lawful and it wants to discuss "damages" to its members and that it would consider filing a charge with PERB if not resolved.

In analyzing the irreparable harm factor, the injury need not have been inflicted when the motion is made; a strong threat of irreparable injury is adequate. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); 11A Wright & Miller § 2948.1. The court finds that the letter from CNA constitutes a threat that is actual and imminent. CNA wants reversal of the unilateral modifications and damages caused by those modifications, threatening administrative action if its demands are not resolved. The tougher question is whether the District's injury is irreparable.

To begin, the cases cited by CNA are not relevant and are distinguishable. The order at issue in *Assurance Wireless USA, L.P. v. Reynolds*, 2023 WL 2873359 (N.D. Cal. Apr. 9, 2023) is an order denying a motion for preliminary injunction. The plaintiffs appealed the order and filed a motion for stay pending appeal. As explained by the district court, the motion is actually a motion for an injunction pending appeal because, unlike a stay pending appeal which temporarily divests an order of enforceability, the order being appealed is an order denying a motion for preliminary injunction so there is nothing to stay. Instead, what plaintiffs wanted is an injunction pending appeal, and therefore "[t]he *Nken* factors do not apply…" *Id.* at *3. Moreover, nothing in *Reynolds* even remotely discusses CNA's assertion that the Motion is premature and should be filed after an award for damages has been entered. As to the case of *Ashker v. Newsom*, 2022 WL 1003178 (N.D. Cal. Apr. 4, 2022), the

---

[8] The Pendency Plan can be found in Exhibit E to the Declaration of Mary Casillas in Support of Emergency First Day Motions, ECF 10.

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL

pages cited by CNA -- *24-25 – do not exist. It does discuss a stay pending appeal and the unremarkable proposition that litigation expenses do not constitute irreparable harm.

The court does not find that the threatened injury is irreparable.

First, the court is not persuaded that the record supports a conclusion that the District will suffer a $7 million injury if it is required to roll back the unilateral modifications to the CBAs made by the District during the bankruptcy case. The only evidence of the $7 million in alleged injury comes from the Casillas Declaration, which states, "CNA seeks to 'make the California Nurses Association members whole' from benefit modifications effected during the pendency of the Bankruptcy Case under the terms of the District's Pendency Plan. I have been involved in the District's efforts to quantify the cash flow benefit *associated with the pendency plan modifications to benefits*. The District estimates that the modifications equated to an approximately $7 million cash flow savings on an annual basis." Declaration of Mary Casillas in Support of Motion, ECF 228, p. 2:8-12 (emphasis added). Casillas offered no support for this figure other than its relationship to the Pendency Plan. To understand the figure, the court reviewed the Pendency Plan's proposed benefit modifications. But at the June 4, 2024, hearing, the District's counsel indicated that it was *not* proper to look at the Pendency Plan to break down the various benefit modifications to learn how the $7 million figure was obtained. Upon further questioning, the District's counsel admitted that there is no evidence to show how the District calculated the $7 million figure. On this basis, the record supports a conclusion that the $7 million figure is illusory.

Moreover, assuming for the sake of argument there is a cost to rolling back these changes, the harm may not be permanent. At least insofar as the changes to CBA's paid time off provisions, the District admitted at the hearing that it would have recourse to recover those funds by sending demand letters or initiating legal action against its employees to recoup the value of the benefits, should the appellate court reverse the Eligibility Order. The District argued, though, that these potential remedies were both "impractical" and "burdensome."

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
10/18

The District has not provided any evidence why recovery would be burdensome or impractical, such as the number of employees affected.[9] More importantly, the law requires the potential injury be beyond remedy: "[t]he key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough." *Al Otro Lado v. Wolf*, 952 F.3d at 1008 (citations and quotations omitted); *see also Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). The alleged injury here is monetary, and the District does not allege that it is not readily calculable or not recoverable in a legal action.[10]

The District also argues that its obligation to make payments in connection with its Defined Benefit Plan would be costly if reversed.[11] This argument is not persuasive. It is worth noting that CNA argues that the District did not propose to eliminate the Defined Benefit Plan. Instead, the District proposed to eliminate contributions that would accrue *after* the bankruptcy was filed. It promised to pay for benefits already earned. The District maintains this change alone was valued at $4 million annually. But nothing in the record

---

[9] The court recognizes that without the bankruptcy case, the District is not able to keep the unilateral modifications to the CBAs in place under California law. *See In re City of Stockton, Cal.*, 526 B.R. 35, 55-56 (Bankr. E.D. Cal. 2015). And without a stay pending appeal, should the District prevail on appeal, the question is whether the District can claw back the benefits paid under the CBAs in the period between the Eligibility Order and the appellate decision. The parties' arguments suggest that it can, but no one directly addresses this legal question. Considering the court's discretion in this matter and considering the overall circumstances, including the lack of evidence on the damages and the lack of showing on likelihood of success on the merits, a stay would in essence allow the District to continue to violate California law notwithstanding the dismissal of the case.

[10] Although monetary injury alone cannot generally establish irreparable harm, the threat of being driven out of business is sufficient. *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985). The District has neither alleged nor provided evidence that it will go out of business as a result of unwinding the unilateral modifications made to the CBAs while this case was pending.

[11] Capitalized terms used but not defined have the meanings given them in the Eligibility Order.

Case: 23-50544   Doc# 249   Filed: 06/07/24   Entered: 06/07/24 16:15:05   Page 11 of 18

supports that figure, including the District's Pendency Plan. Moreover, even assuming it is accurate, the District could seek to recover excess contributions from the plan administrator if the dismissal of this case is reversed. The court cannot find the District met its burden of proof on this point.

Finally, at least one part of the Pendency Plan changes was never made effective. The District proposed to terminate its self-funded model of employee health insurance in favor of a plan being offered by a third party. At the June 4, 2024, hearing, the District stated its effort to secure such a plan was not successful. Reversing the dismissal would have no impact on this element of the District's modifications to the CBAs.

In sum, the District has offered neither competent evidence nor persuasive arguments that it will suffer irreparable injury without a stay pending appeal.

The inquiry on motions for stay pending appeal also requires an applicant to make "a strong showing that he is likely to succeed on the merits." *Nken v Holder*, 556 U.S. at 434. "It is not enough that the chance of success on the merits be better than negligible, . . . [and] [m]ore than a mere possibility of relief is required." *Id.* (citations and quotations omitted). Under the sliding scale approach, where the District's showing of irreparable harm is weak at best, it must make a commensurately strong showing of a likelihood of success on the merits to prevail. *See Al Otro Lado v. Wolf*, 952 F.3d at 1010.

The District challenges most of the court's factual findings and legal conclusions but devotes most of its argument to the discussion of the District's pension contributions. It argues that the court erred by conflating the UAAL with the District's annual contributions, the latter of which is mandatory under California law pursuant to the "vested rights doctrine" and a fiduciary duty imposed by the California constitution. The District misconstrues the court's decision on this issue.

The District did not raise these arguments in connection with trial. In fact, the court expressly noted in the Eligibility Order that "[t]he District does not argue that either federal or state law mandates a minimum contribution rate." Eligibility Order, p. 14 n. 7. It seems

doubtful that an argument that was never made in the trial court can carry the day on appeal. *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009) ("A party normally may not press an argument on appeal that it failed to raise in the district court.").

Anyway, the District makes an entirely new argument in the Motion. It no longer argues that the mandatory contribution to the pension is the amount that is sufficient to fund 1.3% of the employee's annual compensation,[12] as stated in the post-trial brief and in the testimony.[13] Instead, the District's new position in the Motion is that the actuarially determined contributions, including the normal cost and the amortized payment of the UAAL, are mandatory under California law.

None of the cases cited by the District establishes that the vested rights doctrine requires that a retirement system make the recommended actuarially determined contribution each year.[14] In the discussion on the pension contributions in the Eligibility

---

[12] The applicable provision in the CBA states, "the District shall contribute an amount sufficient, in combination with any required employee contributions, to fund a benefit equal to one and three tenths precent (1.3%) of the employee's annual compensation in each calendar year." Additionally, "annual compensation" is defined in the CBA as the employee's base pay. *See* Eligibility Order, p. 18:1-9, n. 9. For the sake of brevity, the court will simply use "1.3%" as the amount of the mandatory contribution.

[13] Direct testimony of Robinson, T2, 170:21 – 171:5:
    District's Counsel: All right. I want to move on to the District's pension program. Do you have an understanding of whether the District is obligated to fund the pension for NUHW-represented employees?
    Robinson: Yes, we do.
    District's Counsel: And what is the basis of your understanding of that obligation?
    Robinson: It's in their MOU.
    District's Counsel: Okay. And do you know what funding is required?
    Robinson: 1.3 percent of their qualified earnings for the year.

[14] The District also cites to *Imperial Cnty. Sheriff's Assn. v. Cnty. of Imperial*, 87 Cal. App. 5th 898, 903–04 (2023), quoting that "[t]wo types of costs must be paid each year to fund the system retirement benefits of County employees: normal cost and the amortized payment of the unfunded actuarial accrued liability (UAAL)." As discussed earlier, this is a new argument raised for the first time in the Motion. More importantly, the retirement system in *Imperial County* pertains to county employees and is governed by the County Employee Retirement Law of 1937 (CERL). *See* Cal. Govt. Code § 31450 *et seq.* The

Case: 23-50544    Doc# 249    Filed: 06/07/24    Entered: 06/07/24 16:15:05    Page 13 of 18

Order, the court acknowledged that the CBAs require the District to contribute enough to fund 1.3% of employee's base pay, as the District argued at the time. Eligibility Order, p. 14:21-22. As explained in the Eligibility Order, the flaw in the District's argument is that it equates this 1.3% contractually mandatory contribution with the actuarially determined contribution. In its post-trial brief, the District states:

> [T]he District is obligated under its agreements with CNA, NUHW, and other unions *to contribute 1.3% of each employees' annual compensation to the defined benefit plan each calendar year. See* Debtor's Ex. 63 at 1718; Dec. 5 Tr. at 172:173:5. Given the variance in the annual funding obligation, the District presented a range of annual pension funding contribution calculations known or knowable as of the Petition Date: (i) the $3 million expense the District estimated when calculating its fiscal year end June 30, 2023 budget, based on estimated "hours [employees] worked that year," Dec. 5 Tr. at 166:21-23; (ii) the $3.7 million actuarially determined obligation in the District's financial advisor understood was actuarially determined as of the Petition Date, see id. at 16:6-14; and (iii) the $4.05 million actuarially determined amount the District's actuaries calculated postpetition effective as of the Petition Date, see Debtor's Ex. 68, at 1843.

Debtor's Post-Trial Brief, ECF 169, p. 7:7-17 (emphasis added).

As an example, the $4.05 million amount, taken from Debtor's Exhibit 68, shows that the amount consists of normal cost of $1,900,000, amortization of $2,250,000, interest of $130,000, minus the expected employee contribution of $230,000. The amortization amount is to pay down the current UAAL over a period of years. The 1.3% mandatory contribution is likely a subset of normal cost, which consists of the contribution necessary, after taking into account investment income, to pay for the benefits earned in a particular year. *See* Eligibility Order, p. 15:17-21 (defining normal cost). But the exact amount was never discussed or admitted into evidence.

The court concluded the entire actuarially determined contribution is not presently due not because the District is not required to make *any* contribution, but rather because the

---

statement quoted by the District was followed by applicable statutory citations in the next paragraph, including Cal. Govt. Code §§ 31453, 31453.5, and 31454. The District, at no time, argues that its retirement system is governed by the CERL or any of its provisions.

Case: 23-50544   Doc# 249   Filed: 06/07/24   Entered: 06/07/24 16:15:05   Page 14 of 18

District failed to provide any evidence as to the amount of the contribution necessary to fund the 1.3% required by the CBAs. The court makes this very clear in the Eligibility Order (p. 20:17-22). The court provided several reasons why the 1.3% mandatory contribution cannot be the entire actuarially determined contribution. The District did not address that discussion in its Motion. For example, the court observed that if the $4.05 million in actuarially determined contribution is 1.3% of the participating employees' annual compensation, the District would have a payroll of more than $311.5 million. Eligibility Order p. 18:1-6.

The District also argues that it must pay the actuarially determined contribution because "California's constitutional fiduciary obligations recognize a present obligation to make annual, actuarially determined contributions to a pension necessary to fund future benefits regardless of whether the benefits are present due." Motion, p. 9:17-19. Nowhere in the case cited by the District, *O'Neal v. Stanislaus Cnty. Employees' Ret. Assn.*, 8 Cal. App. 5th 1184 (2017), does it hold that the failure to make actuarially determined contributions constitutes a breach of fiduciary duty under California law.

This argument (as well as the vested rights doctrine argument) is problematic at best. For if the District alleges that not paying the full actuarially determined contribution is unlawful, it must admit that it violated the law from 2018 through 2022 when it paid that amount in only one year. Eligibility Order, p. 20:1-11; Joint Exhibits J2 – J5; NUHW Exhibit B38. Robinson testified that "[t]he District historically has not funded the additional amount that Nicolay has suggested we fund in order to catch up with the long-term funding liability." T2, 180:21-23. In other words, accepting the District's argument would mean that the District admits it has breached its fiduciary obligations and violated the vested rights doctrine under California law as far back as 2018, possibly earlier.

In sum, the District has always argued that it is required contractually to contribute enough to fund 1.3% of the participating employees' annual compensation to the pension. The court rejected the District's contention that this obligation can be equated to the

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
15/18

actuarially determined contribution amount. Considering that the District has the burden of proof on eligibility and without any evidence of the proper contribution due, the court could not include the pension expense in the insolvency test. Given the evidence, the District's arguments, and the court's understanding of the law, the court cannot find the District is likely to prevail on this argument.

The District's waiver argument is nonsensical. It asserts that the court failed to reconcile the District's evidence that it was not cash flow insolvent on the petition date with its argument that it did not pay the IRS debt and pension contributions. But it is the District's burden to reconcile its arguments with its evidence. And notwithstanding the court's statement that the District conceded it was paying its debts as they came due on the petition date, the court indicated, "[i]n the interest of completeness, the court will address the District's contention that it is insolvent because it has not paid its current pension contributions and 2021 payroll taxes." Eligibility Order, p. 14:16-18. The court's analysis of the pension and payroll contributions consumes at least eight pages of discussion in the Eligibility Order. Thus, even assuming the District were correct that it did not waive insolvency under § 101(32)(C)(i), it is a harmless error as the court discussed and evaluated the District's substantive arguments on this issue.

Next, the District argues the court applied the wrong standard in assessing insolvency, imposing a GAAP-based insolvency standard. That is not so, and conflicts with the court's statement that GAAP is not the legal standard. Eligibility Order, p. 26:1-19.[15] The essential point, the court supposes, is that the District believes the court imposed too high a burden on the District by requiring accurate and reliable projections for prospective insolvency. But the court is unaware of any cases, let alone cases the District cited, that say projections for the purpose of § 101(32)(C)(ii) do not have to be grounded in reliable data and method.

---

[15] The District cites to the same cases and uses the same quotations in the Motion as the court did in the Eligibility Order that GAAP is not the legal standard.

Case: 23-50544    Doc# 249    Filed: 06/07/24    Entered: 06/07/24 16:15:05    Page 16 of 18

The District, in its Reply, argues that cash projections can never square with actual numbers. That is absurd – projections can always be compared to actual results. But it is also the wrong argument. The problem is this: B. Riley constructed its cash activity report from January through April 2023 and its report was derived from the District's *actual data*. T2, 54:22 – 55:4. B. Riley's cash analysis for these months is significantly different from the District's internal financial statements, which rely on the same data. While it is true that the District's financial statements are GAAP-compliant and the B. Riley projections are not, the numbers are not completely unrelated. They come from the same essential factual data. In any event, the simple truth is that the court did not find the B. Riely projections reliable for the reasons mentioned in the Eligibility Order.

The remaining arguments from the District contest the court's factual findings and are variations of the arguments it made in the post-trial brief. The court made factual and credibility findings based on the evidence presented at trial. The points raised in the Motion amount to reargument and do not support a stay. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous). Rather than repeat its conclusions, the court will rely on the discussion laid out in the Eligibility Order.

Because the District has not satisfied the first two factors of the test for a stay pending appeal, the court does not need to reach the remaining two factors. *Sierra Club v. Trump*, 929 F.3d at 687.

For the foregoing reasons,

IT IS HEREBY ORDERED that the Motion is DENIED.

*** END OF ORDER ***

**COURT SERVICE LIST**

[ECF recipients only]

ORDER DENYING DEBTOR'S EMERGENCY MOTION FOR STAY PENDING APPEAL
18/18